ZEHMER, Judge
(dissenting).
I would adhere to the panel decision and reverse the appealed judgment because this record is legally insufficient to show that appellee carried its burden of proving by clear and convincing evidence[1] that appellant is guilty of abuse and neglect of the two children. Needless to say, my views of the issues presented for trial, what the evidence in the record before us proves, and the legal consequences under the applicable statutes, differ considerably from that recited in the en bane opinion. The en banc opinion creates a factual scenario that is not supported by the record, relies on facts not found by the trial court in the appealed order, and cites case authority that is not applicable to the true facts. In order to accurately understand this case, therefore, it is necessary to discuss in considerable detail the issues, the trial, and the appellate proceedings.[2]
THE ISSUES
The Department of Health and Rehabilitative Services commenced this proceeding for termination of parental rights by filing a petition in the circuit court on July 27, 1987. The petition alleged that both DJS and JG had been adjudicated dependent children by order of the court dated July 21, 1986, and that jurisdiction of the children had been retained continuously since that date in the custody of the Department. The allegations of the grounds for terminating all parental rights recited only that:
a. The children have been severely neglected by their biological mother over an extended period of time despite numerous opportunities for the mother to change her parenting skills and her approach to her children. She has been offered two performance agreements, one of which was extended, and all of which she failed although she was able to comply.
b. That the father, John [Doe], physically abused [DJS] and- was placed on probation as a result of this abuse. He has not exhibited an ability to change his behavior toward [DJS] nor his own child [JG] and he has neglected his child by allowing Betty [the mother] to retain custody of his child which placed his child at risk. He has been offered two performance agreements, one of which was extended, and all of which he has failed although able to do so.
The petition further alleged the identity of each child’s biological parents and prayed for an order of permanent commitment. (R. 357-59). No amended petition or motion to amend was ever filed by the Department prior to the final hearing and entry of final judgment.
The court appointed private counsel for the father, John Doe, pursuant to statutory authority, and counsel filed an answer placing all material allegations except paternity in dispute. On October 28, 1987, counsel filed a motion for appellant seeking rights of visitation with his son, JG, and also with DJS, alleging that the Department had denied him visitation with his son for “the *672 past twelve months.” The motion was denied. The case was set for trial on the issues made by the petition and answer, and the final hearing was held in December 1987. Immediately upon conclusion of the trial, the trial court announced from the bench that the petition would be granted and directed the Department’s counsel to prepare a written order to that effect. The written final judgment containing findings of fact and conclusions of law as required by section 39.467(6), Florida Statutes (1987), was rendered on December 29, 1987.
THE TRIAL PROCEEDINGS
At the outset of the trial, counsel for the Department requested the court
to take judicial notice of the Court file in this matter and with the statutory changes which have occurred to Chapter 39 beginning effective October 1 of this year, believe its necessary and specifically within the Court file, the July 21st adjudication of dependency with the disposition of foster care. The June 24th 1987, transfer to adoption related services the birth certificates of both children and the (inaudible), [sic]
(R. 6-7).[3] Counsel for the parents objected to the court judicially noticing reports of the various agencies and individuals containing hearsay and “those hearsay statements.” Appellant’s counsel specified that while the person making the report could testify, only “their personal observation” was admissible, and “any other information or evidence they attempt to introduce that they’ve obtained from other written reports which would be hearsay, be on the third part, I object to.” (R. 11-12). The court thereupon ruled, “Subject to the objections announced by counsel, the Court will take judicial knowledge of the contents, the entire contents of the Court file.” (R. 12).
The first witness called by the Department was Wanda Green, an adoptions counselor employed by the Department. She identified pictures of the children and told the court that the Department had arranged for the children to be adopted. On cross-examination she conceded that the Report of Notice of Judicial Review dated November 25, 1987, that she had filed with the court (it is not in the record on appeal) was all based on hearsay and not her personal knowledge. (R. 12-19).
The Department’s next witness was Robert Napier, a licensed psychologist. Based on an evaluation he had conducted at the Department’s request and expense, he testified mainly about the mother’s psychiatric history and condition and expressed his opinion on her lack of fitness as a parent. He had not been asked to evaluate either child; and he had not been requested to evaluate the father, John Doe, for fitness as a parent, and thus made no recommendation as to him. (R. 20-48).
The Department then called Joe Stanton, a probation officer with the State of Florida, who testified concerning John Doe’s criminal record and terms of probation and community control. He indicated that John had completed all required probation at the time of the trial. Most of his testimony was based on what John Doe had told him, and included statements by John that the 1981 incident was the only time he had hit the child and it would not happen again. He said that John made an effort to cooperate on probation. (R. 49-59).
The Department called Paul Brown, a deputy sheriff, who testified that he investigated the 1981 child abuse incident involving DJS. He described the occurrence as an altercation involving John and Betty, the mother, and said Betty told him that John did not intend to hit the child. He testified that he also had investigated other domestic disturbances involving John and the mother, but gave no details. (R. 60-65).
The next witness for the Department, Carmine Luisi, Jr., had rented the home to John and the mother in 1981 and testified about the 1981 incident with DJS as quoted in the en banc decision. He identified photographs of the boy taken at that time and *673 described seeing blood on the mother’s face. He said that he knew of no other similar incidents involving John and Betty. (R. 66-70).
Sylvia Vickery, one of Betty’s neighbors in 1986 (at a time when John Doe was not living with Betty), testified for the Department and described an incident in January 1986 when one child was sent to school by Betty improperly dressed for the cold weather, i.e., no coat. (R. 71-76).
Harvey Hanson, a district intake counsel- or for the Department in 1986, testified that he investigated an incident in June 1986 when Betty, who had custody of both children under Department supervision, had left the children unsupervised for an extended period of time. The incident was reported by John Doe who asked the Department to investigate. This witness said the children indicated they wanted to stay with John Doe, so he released the children to him on condition John would return them to the mother the following day. He said John acted out of concern for the children and acted responsibly as a parent. (R. 78-83).
The next witness, Richard Schwab, an intake counselor for the Department, testified about the January 1986 incident when Betty sent DJS to school without a coat. He also described an alleged incident in March 1986 when Betty’s boyfriend Richie threw DJS to the pavement, and said on cross-examination that, although the incident was not “substantiated” after investigation, he did not close the file because he suspected there was some abuse. Thereafter, he investigated the June 1986 incident when Betty left the children unattended and John Doe complained. His investigation revealed no abuse by John Doe and that John Doe acted responsibly. He said that John Doe asked him about getting custody of his son and DJS at this time. (R. 84-102).
The Department’s next witness was Pamela Medaugh, JG’s school teacher at preschool for the year 1986-87. [During this time JG was living with foster parents under the Department’s supervision]. .She was not a licensed teacher, but helped with preschool children. She recounted difficulties she had with JG in school, describing him as “doing extremely well around Christmas time and the first of the year,” but in March his behavior reverted to uncontrolled aggression, similar to what it was in September, so she had to ask the foster parents to remove him from school. She also described an incident when she was baby-sitting for the foster parents, when JG spit out some medicine she was giving to him and then licked it from the floor, saying that’s how my mommy and daddy taught me. On cross-examination, she stated more specifically that JG “just said he had learned it from his mother and that was all he said.” (R. 103-108).
Sandy Cesulka, the next witness, had been employed by the Department in protective services. From February 19, 1982, until May 30, 1986, she worked with these children, Betty, and John, whom she called the family, investigating the home situation and assisting the family. The mother gave her minimal cooperation. She visited the home once a month or more often, and described observations without relating them to any particular date during the four-year period.[4] She described her understanding that John and Betty lived together off and on during various portions of this four-year period, and that they would fight with each other violently at times. She observed broken doors and windows, and holes in the wall, but did not identify the dates or places where this occurred. During the four years she worked on the case she never found the children unattended. She said that John would get angry when he and Betty were separated. DJS was under the Department’s supervision continually after the 1981 abuse incident. JG was picked up by the Department on a voluntary basis after he was born. John made complaints about Betty *674 throughout her supervision, and said that “we” (meaning the Department) were not doing anything about things going on at Betty’s home. She confirmed that she had no incident with John Doe. She recounted that John was on probation after the 1981 child abuse incident and was not supposed to be in Betty’s home, but came around at times, and later on moved in with her. In 1985, Richie M. moved in with Betty in a relationship that excluded John Doe. She opined that John and Betty’s stormy relationship was detrimental to the children, but that during the four years she never felt the home conditions were such that the children should be removed from the home. No dependency petition as to John’s son, JG, was ever filed prior to May 1986 when she left the case. She recalled that some of the complaints about the children that she investigated came from John Doe. She explained that John and Betty began living together about six months after she started on the case (i.e., about August 1982) and lived together for about two and a half to three years. She was not sure that John and Betty were living together when John made the complaints. John complained to her that Betty was not using the AFDC checks for the children’s food but was buying drugs. During the time that John was ordered to stay out of the home after the 1981 incident, he did not live there but would visit from time to time. When John and Betty split, the children were frequently visiting with John’s mother, and John would see them at those times — “He had quite a bit of contact with them.” In response to questions from the court, she said that John and Betty were counseled about marriage and establishing a stable home, but it did not come about due to basic personality differences. (R. 108-124).
The next witness for the Department was Priscilla Martin, the foster mother who took custody of the children in July 1986. She described JG’s emotional condition when he first came to her home. She testified that JG "didn’t seem to have emotional stability to play with children of his own age, he was fretful, upset extremely easy, very small in stature,” "a little bit underweight.” He was unhappy, fearful of other children, fearful of adults, distrustful, had an eating problem, and would forget to go to the bathroom. JG would forget what he was supposed to do. Other children found him difficult to play with. He was three and a half, but related more to younger children. She described his condition at the time of the trial as much improved, outgoing, relating better with children, not forgetting like he previously did. His eating habits had improved. The witness referred to lots of visits to family members, without naming which ones, as being upsetting to the boy. She then described the condition of the other boy, DJS, when he first arrived. He wet the bed, “but that is not too unusual for a child of six or seven particularly in a move or emotional upheaval and he was able to stop that after about six months.” He was not polite, running in the hallways, and did not want to listen to adults, was distrustful of them and what they had to say. “Today [DJS] is the most polite little boy you could ask for,” happy and “doing beautiful in school” with lots of friends. He was performing school work satisfactorily. In response to a question by counsel for the Department asking if DJS “ever made any comments concerning his father, John Doe [John is not the natural father of DJS], the witness said DJS had made up a song about “his father,” and sang “My Daddy’s bad, My Daddy don’t love me, My Mommy don’t love me, My Daddy’s bad, he’s in jail and he just kind of repeats it.” Those were the only times he ever mentioned his father. On cross-examination, she stated that nothing in the song indicated that “Daddy was bad to me, that Daddy did bad things to me.” DJS visited with John Doe on one occasion last spring, and after that “he was a very upset child” — angry, aggressive. John’s mother was present at this visitation. This behavior would last about two days and was not restricted to visits with his father, but with his mother, grandmother, and personnel from the Department as well. DJS had some cards from his father, Christmas cards and the like, expressing love for the child, which he *675 held onto and “I read them to him many times.”[5] (R. 124-135).
Diane Van Holdt, a CYS counselor in foster care employed by the Department, was the next witness. She administered the performance agreements between the Department and John Doe. She stated that two agreements were made with John, one in July-August 1986 and a renegotiated agreement in November 1986, which expired in February or March 1987.[6] After discussing Betty’s performance agreement, the witness began to describe the agreements with John and his failure to comply. She stated John did not get a drug evaluation as required, telling her that he could not pay for the drug and psychological evaluation; but she told him that it was part of the agreement he signed and agreed to perform. Continuing, she testified that he failed to attend parenting classes, but was incarcerated so he could not attend, and that he was in arrears in child support some $2500, having made several payments in 1983,1984, and 1985. She said the suitable shelter provision of the agreement was not applicable because John lived with his mother. She testified that the psychological evaluation was not done, but was discussed with Dave Smith of the Department of Corrections while John was in jail on November 12. John “had emphasized to me at that time that it wasn’t the money at that time, it was the time,” but he did not agree to financial responsibility for the evaluation. The individual and family therapy recommendation by an evaluator was not done, she testified, but “I don’t know if there would be any requirement to that degree.” John signed the second performance agreement in November while in jail, and it was substantially the same as the first one, according to her testimony. She said he did nothing to comply with the drug evaluation beyond taking the two-phase test, and that she talked to him about setting the test up through the criminal system. On cross-examination, it was made clear that her supposed knowledge of the availability of parenting classes was based entirely on hearsay. (R. 136-184).
Ms. Van Holdt explained on cross-examination her understanding that state law required the Department to enter into a performance agreement only with the parent having custody of the child, in this instance Betty; “We are not bound by law, to my knowledge, to even enter into one with John because he was not the custodial parent but we do that in an effort to try to place these children as quickly as possible out of foster care." (R. 184-85). John was not a custodial parent, she said, so the Department made a performance agreement with him because it was a part of the court order of July 21, 1986, adjudicating dependency of the two children;[7] therefore, the performance agreement was not directed to John’s getting custody because he was a parent of only one child. (R. 187-88). John was not permitted by the Department to participate in custody of the child, she said, primarily because of his record of child abuse; nor was he considered for foster care. She discussed with the probation officer that further drug *676 evaluation was not necessary because John tested negative on the second urine test. She acknowledged that the parenting classes were canceled, and John said he did not want to go to the same class with Betty and her new boyfriend, Richie M., and asked for alternative classes. John pleaded nolo contendere to possessing marijuana and was incarcerated in November. She described-John’s economic and home situation with his mother and characterized it as being unstable based on what John said. John’s mother declined to take custody of the children, but his mother never said she would not allow John to live in her house with the children. This witness said she never visited John’s mother’s home, and thus never considered it as suitable shelter for the children. (R. 188-198).
The next witness for the Department was Diane Molitaris, the guardian ad litem appointed by the court for the two boys in June 1986. She had submitted a report to the court, and counsel represented they had a copy. She discussed the fact that she conducted an investigation and filed the report with the court. She interviewed a number of people, including Betty and John, and ran criminal records checks at the sheriff’s office and the probation office. She then read from her report concerning John’s criminal history. It included several DUI charges, the child abuse incident in 1981, and an unspecified incident in 1983. She discussed the performance agreement with John at the county jail, and discussed what could be accomplished in the criminal justice system. She discussed generally his noncompliance with several provisions of the agreement. Her testimony that he did not comply was based on “looking through the files at the department.” She explained that she had served as a guardian ad litem for 49 children, and was then asked to give her opinion concerning the termination of parental rights of Betty and John. Based on her review of the files, she recommended that their parental rights be terminated and that the children be put up for adoption. (R. 201-209). It should be noted that this witness was not qualified as an expert witness during her testimony.
On cross-examination, Ms. Molitaris further explained her understandings with regard to Betty's lack of fitness as a parent. Her knowledge was based on what was found in the Department’s reports. (R. 209-219). Regarding John, after her initial conversation with him regarding the performance agreement and his stated desire to comply, she had no follow-up visit to discuss his ability or inability to comply. She left this matter up to David Smith, who works with persons in jail. Her testimony that John did not comply was based on her review of the Department's records. She observed that DJS would act as “the parent figure” for JG in the foster care home and when the three of them were together. This could be equated to a “big brother role.” She further discussed many of the things contained in her reports to the court. She opined that John’s uncertain income and home situation did not satisfy the Department’s requirement for suitable housing because it was not supported by documentation, such as “a letter from his mother stating that he was paying her X number of dollars rent each month and that she understood that if the child came to her with him, that the two of them, that would be their home.” (R. 220-26). This lack of documentation was noncompliance with the performance agreement requirement that he maintain a household. She also reported to the trial court that John was not comfortable with the children living with Betty and Richie M. because they would not make a fit home for them. John told her he would rather see his child with Betty or in foster care, because if adopted he could not see the child anymore. She said, “I sympathize with that feeling,” but “it does not bring to me that he was looking at the best interest of the child.” When asked if John elaborated any further on this statement in terms of his hope that he would be able to have the ability to take care of them, she responded, “He cried, that was verbal enough.” (R. 227-228). She then described visits by John and his mother with the children while they were in foster care. She said, based on her conversations with the foster parents, that DJS would exhibit aggressive *677 behavior after visits with Betty and John. DJS’s statement that “Daddy is in jail, he is bad,” was based on John’s explanation to DJS that he was in jail because he had done bad things. “John did a very good job” explaining that, and DJS was mainly repeating what John said. DJS never said that John was bad to him or JG. Although Dr. Napier had evaluated Betty at the request of the Department, he had never been asked to evaluate John. (R. 228-41).
In response to questions by the court based on the guardian ad litem reports in the court file, Ms. Molitaris stated that Betty and John would never be able to give the boys a stable home, so she recommended termination of both parents’ rights. She was then asked by the court about her prior testimony based on her last guardian ad litem report recommending such termination. She explained she had fluctuated back and forth on this matter but then stated,
John’s incarceration made me realize that his life was totally unstable, he had been in and out of minor scrapes and in and out of jail and I didn’t see that that pattern was ever going to get any better. When I visited him in jail and he told me that it was a dumb thing to do to have the cocaine, I believe it was, [it was marijuana] in the van, he should have thrown it away, I thought, he doesn’t realize that it was a dumb thing to have it in the first place, that he knew he was on probation, it was violation of probation so I realized that he wasn’t a stable person and could probably not give a child a stable life. With Betty, I think it came at the time that her relationship with Richard M. became very violent and he choked her and then finally broke her jaw and yet, it was like, like it was a party almost and in fact when her jaw was wired shut, she made the comment to me and she had at that point, practically lost her job, that this gave her some time to go get a tan at the beach and I thought this is not a mature person that can — that can mother and give children a stable home. I think those two incidences [sic] came at the time and brought it to a conclusion to me that placement in the home of the parents, was not possible.
(R. 242-43). On further cross-examination by Betty’s counsel, this witness described the small, stark rooms where visitations by Betty and John took place under the constant supervision of a Department worker once the Department took them into custody. Concerning the 1981 incident, she said:
A. Well, its my understanding that Betty and John were living together and that [DJS] was an infant and that I’ve heard that Betty was holding the child and that John went to hit her, and most of this came from John’s statement, that he went to hit Betty and he missed and he hit the child. The child had damage to an ear and an eye and was not directly taken to a hospital until [the] landlord, its my understanding, said the child should be taken to a hospital and that John took the child to the hospital and that later Betty was at HRS or at the hospital, I’m not sure which, and that she also had bruises, that’s my understanding.
(R. 246).
The Department then rested its case. Motions to dismiss contesting the legal sufficiency of the evidence to sustain the Department’s petition were made by both parents and denied. (R. 251-65).
The mother, Betty, testified in her own defense. In respect to John, she explained that they lived together about three years. Her first contact with the Department occurred in connection with the abuse charge against John in 1981. John could not stay with her after his conviction, so she lived as a housekeeper with another man until welfare payments started, when she moved into a trailer, and then John moved in with her. She described John as harassing her and disapproving of any man being with her. She acknowledged that John made numerous reports to the Department concerning the boys. (R. 266-76). She wrote a letter to the probation officer in March 1982, in which she stated that John did not mean to hit DJS: “John wouldn’t and didn’t hurt [DJS] on purpose. It was me he tried to hurt. I grabbed [DJS] out of bed in the *678 dark. John must have hit him by accident, neither of us knew he had been hit until the next day when John took him to the hospital. It never would have happened if John had not been drinking, as I stated in the police report.” (R. 390). She reaffirmed at trial this was true. (R. 284). She described DJS as well behaved — that he did not urinate on furniture [as the foster mother testified], so that started after the Department took him in custody. She never told her son to lick the floor and never saw him do that. (R. 284-85). She described John as a good father, that he loved the boys, but he should not have custody because she wanted them with her and her new husband. [Betty had recently been married.] She thought John could provide them a stable home, but she wanted them. (R. 300-01).
On cross-examination by the Department, she described the incident in 1985 when John came to her boyfriend’s condominium at 5:15 a.m. looking for her. John came in the door and her boyfriend shot John in the leg. She doesn’t know if John was going to beat her, but he wanted her out of the apartment. She had left the two boys with her sister. After she and John separated, he harassed her. He broke a sliding glass window at her apartment. He drove around the neighborhood squealing the tires. He never got physically abusive during their separation, however. When living together they would fight, and he would hit her. (R. 302-314). On cross-examination by John’s attorney, she testified that John followed her around and harassed her out of his concern for the children. John loved DJS, never abused him, and never neglected him. [At this point the tape recording is inaudible and a portion of the tape is missing.] She would not object to John having the children if she could not. She believed John would be a responsible parent. (R. 315-17).
John Doe was the next witness in his own behalf. [There are a number of inaudible portions of the tape throughout his testimony.] His mother had no objection or problem with him living with her and the two children. . She would help take care of the children. He then described his current employment as a carpenter. He served 11 months of a 30-month sentence in 1986-87. In 1986 he contacted a Department intake counselor, Rick Schwab, and complained that Betty was not spending the welfare money on the children. He asked Schwab about getting custody of the children when he had a two-bedroom trailer. He acknowledged signing two performance agreements, and said they were similar. Regarding the drug and alcohol evaluation, he went to the alcohol guidance clinic, but when he told them he was on probation, he was told to get it through the probation officer. He then got the two urine tests through that officer. The first test was positive, but the second test was negative, so the probation officer did not recommend further drug evaluation. John explained that he did not comply with the parenting class requirements because he had an altercation with Betty’s boyfriend, Richie M., concerning Richie’s abuse of the boys. He confronted Richie and hit him. After that, John told Ms. Van Holdt that he could not attend classes with Betty and Richie and asked her to find some alternative means to satisfy this requirement. John testified that a number of these classes were canceled. [Betty’s testimony and supporting documents in the record indicate that these classes were canceled on several occasions.] John was employed pri- or to his last incarceration and lived at his mother’s house, and he thought that this was in compliance with the performance agreement regarding suitable housing. He disputed the criminal charges recited in his presentence report, and said he had only one DUI offense. He then described the 1981 incident in which DJS was hit. He had been drinking. Betty was out and he stayed with DJS because he did not want to leave him alone. Four hours later Betty came home. They argued, and he went to the dark bedroom and lay down. Betty came in saying something and he swung at her and hit DJS. He did not know she was carrying the baby. He did not intend to strike the child. He regretted that this happened and never struck him after that. *679 He had never struck JG either. (R. 319— 34).
On cross-examination by the Department, John testified that if he got custody of his son JG he would raise him as a father, live at his mother’s house. She would help. He would work so that eventually he could get a place of his own. If the court gave him DJS, he would take care of him and would like to adopt him. John said that he did not now use drugs at all, and sometimes drinks a beer. He was not on probation at this time. (R. 335-36).
The court then asked John what should be done with the boys if the court did not give either one of them to John. After some confusion, he answered, “Sir, I’m at a loss to answer that question.” John was not sure that Betty was fit to have them. (R. 336-37). The Department’s counsel then continued with further cross-examination and developed more detail about why John felt that Betty should not have the children. John was questioned again about the incident when he struck Richie M. for dragging DJS down the stairs and throwing JG out of a door. John described his understanding of the violence between Betty and her other boyfriends. John recited two instances when Betty asked him for money because Richie had spent two welfare checks on drugs. Counsel reviewed the 1981 incident involving DJS and the incident when John was shot when entering the condominium in 1985. John thought the children were there with Betty in her boyfriend’s condominium, and she was supposed to be at home with them. “I just— I’m not going to stand for something like that.” He said he saw the children there. They were in the bedroom sleeping when he was shot. He had tried but had never obtained a psychological evaluation as required by the performance agreement. He did not know the Department would have paid for an evaluation, and they never offered to have one done. He did not have the drug and alcohol evaluation because the second urine test was negative, and they said if the third was negative he would not need an evaluation, and they never gave him the third one. (R. 337-44). On further cross-examination by Betty’s counsel, John said that Betty was incorrect in stating that the children were with her sister and not with her in the condominium when he was shot by her boyfriend. John reported the incident with Richie to the Department and the police. He took the boys to the hospital. John said that he had no relationship with Betty now. Betty told him about using drugs and he had seen syringes around. (R. 344-48). John stated that he now had good employment, and believed he could be a good father; he loved the children.
The next witness was John Doe’s mother. She had lived in her house since 1969. She had a conversation with Diane Van Holdt regarding DJS and JG, and told Ms. Van Holdt that she could not take both children, as she was too old and her income was not that secure. However, they were talking about her taking legal custody and full responsibility for the children and adopting DJS, as she was already the grandmother of JG. She and Ms. Van Holdt did not discuss John having custody of the boys, but she had no objections to John having custody and their living with her. She said John loved the children. She knew of no occasion when John neglected or abused either child. (R. 348-51).
Betty was then recalled by her counsel and denied several of the incidents as testified by John. (R. 351-53). In response to the court’s question, “Do you think he [John] was lying under oath,” she responded, “Yes” and explained that she thought John “just doesn’t want me with other men. I don’t care if it was Jesus Christ, he wouldn’t be good enough to be with me— he’s vindictive....” She felt he wanted the kids with him and “he’ll do whatever he can to make sure I don’t get them.” (R. 353-54).
At this point, the testimony ended. The Department’s counsel then stated to the court:
“[T]his is also the time for the Judicial Review of this case and I’d like to submit to you, your Honor, the Judicial Review which is part of the statute in this particular case.
*680 JUDGE FLEET: What is this you’re handing me? An order to schedule a Judicial Review?
MR. JOHNSON: No, Sir. This is — I suppose it’s a Motion by the Department that this hearing, itself, in addition to being that of determination of parental rights, also be the Judicial Review that’s required to be done and this Order has been prepared maintaining the status quo for the time being.
* * * * * *
JUDGE FLEET: And you really want me to schedule a Judicial Review?
MR. JOHNSON: No, sir. I’m asking for this hearing, itself to stand as that Judicial Review? [sic]
JUDGE FLEET: What [sic] you want? You want a Judicial Review or you want a final hearing—
MR. JOHNSON: I want a final hearing, your Honor.
(R. 354-55). Thereupon, the court denied both parents’ renewed motions to dismiss, and without hearing any argument from counsel announced the following ruling:
Gentlemen, this case has had a long history. These children have been under supervision of the department for many, many years as well as these parents. It’s the opinion of the Court that both of these parents have physically and mentally neglected and abused these children and abandoned them morally as well. It is therefore, the judgment of the Court that their parental rights shall be terminated as to both children and they should be returned to the department for an adoption. You can prepare an Order accordingly, Mr. Johnson.
(R. 355). The written order, entitled Final Judgment, prepared by Mr. Johnson recited, among other things, that the court took judicial notice of the court file in this matter “excising those items which are inadmissible hearsay.” (The items so admitted and excluded are not and have not been identified.) It then set forth numerous findings of fact with parenthetical references to the evidence relied on to support the particular finding. Several findings refer simply to “Court file.” For example, the judgment recites that “Both children were adjudicated dependent by this Court on July 21, 1986, and ordered into foster care. (Court file).” (R. 394). Similarly, it recites that upon the Department’s motion “the children were transferred to the Adoptions and Related Services Unit on June 24, 1987. (Court file).” (R. 395). The findings pertinent to John Doe are as follows:
11. On October 23, 1981, John [Doe], in a physical altercation with Betty, hit [DJS], severely bruising his face in nine places. (Paul Brown, Deputy Sheriff).
12. Neither Betty nor John took [DJS] to the hospital for needed medical treatment until approached by their landlord, Carmen Luisi, that it was necessary to do so on the evening of October 24, 1981. (Carmen Luisi).
13. John [Doe] would regularly, about weekly, physically abuse Betty during the period of time that they were living together. (Betty).
14. John [Doe] has a history of violence with a criminal conviction for child abuse, burglary, drug offenses, and an inability to comply with probation and community control standards. (Joe Stanton, Probation Officer).
15. During the early morning hours of June 18, 1986, the children were discovered left alone while in the custody of the mother. Harvey Hanson took custody of the children at the request of the Okaloosa County Sheriff’s Department and turned the children over to John [Doe] for safekeeping. (Harvey Hanson).
16. Later that day the children were returned to Betty and when the matter was investigated by Richard Schwab of the Department of Health and Rehabilitative Services, the child [DJS] was alone in Betty’s home and unsupervised. (Richard Schwab).
17. Prior to the dependency adjudication which led to this termination of parental rights hearing, the child [DJS] was found to be dependent and was under protective services supervision, Department of Health and Rehabilitative Services, where numerous services were pro *681 vided to Betty to help her change her behavior and increase her parenting skills. These efforts were of no result and no improvement occurred. (Sandy Cesulka).
18. When the children were first brought into the custody of the Department of Health and Rehabilitative Services and placed in foster care, [DJS] was wetting his pants, angry all of the time, and would fight at the drop of a hat. He would also be very loud and boisterous in a group. The improvements since July of 1986 has shown that [DJS] is developing the ability to play with children of his own age, he is now up to grade level in school removing his lack of reading skills. [JG], in July of 1986, when taken into foster care, was socially very far behind children of his own age group of 3V2 years. He is still behind his age group but is improving. At first he would whimper all of the time and he was not able to go to the bathroom without someone assisting him. He would sit and stare in space. At first he would have to be fed 80 percent of the time, but now has improved to where he will eat himself most of the time and only requires feeding by others 5 percent of the time. He has reduced the soiling of his pants and is now sleeping at night. [JG] and [DJS] have both discussed an incident in which [JG] almost drowned when visiting their mother. (Priscilla Martin, Foster Mother).
19. John [Doe], although able to do so, has not substantially complied with either performance agreement presented to him and agreed to by him. (Diane Von Holdt).
* ⅜: * ⅜ * ⅜
21.Betty did obtain psychological evaluations and complied with that requirement of the performance agreement. (Diane Von Holdt). John [Doe] did not get an alcohol and drug evaluation nor a psychological evaluation as required by the performance agreement due to the reasons presented by him that he was either unable to afford to do so; even though he never sought to do so at the expense of the Department of Health and Rehabilitative Services, and that he was too busy to have it done. (Diane Von Holdt).
22. Neither John [Doe] nor Betty will ever be able to give these children a stable permanent home necessary for these children to become productive adults. (Diane Molitaris, Guardian Ad Litem).
23. John [Doe] was arrested as a juvenile for possession of marijuana and placed on 3 months probation. After that he began a long history of driving while intoxicated, driving while his license was suspended and disorderly intoxication between January, 1979, up to November, 1986. (Diane Molitaris, Guardian Ad Litem).
Based upon the foregoing, it is specifically found that,
* * * * * *
2. That clearly and convincingly, the children have been abused and neglected by both John [Doe], the father of [JG], and Betty, the mother of both children.
3. The abuse and neglect of the children at the hands of both parents has occurred over a long period of time and is ingrained, with no reasonable likelihood of change. The abuse and neglect suffered by these children has occurred over a long and extended period of time and the only way to prevent this abuse and neglect from occurring again, is to terminate the parental rights between the parents and the children.
(R. 396-98).
THE APPEAL
Appealing this judgment, John Doe contends that the state has not carried its burden under the clear and convincing evidence standard of proving abuse and neglect sufficiently to authorize the court to sever permanently the father’s parental rights. Concisely summarized, appellant argues that the state cannot rely solely upon a parent’s criminal conviction of child abuse, remote in time and concerning a child of no blood relation to him, as the basis for severing parental rights. Fur *682 ther, appellant argues that he was at all times a noncustodial parent and has demonstrated a persistent pattern of parental responsibility towards his son, and thus he cannot be found guilty of neglect while the child was in the mother’s custody under supervision by the Department. He further argues that failure to comply with the performance agreements cannot provide the sole basis upon which to terminate his parental rights.
The Department responds in a short, nine-page answer brief. It agrees with the statement of the facts and the case in the appellant’s brief. In a one-and-a-half-page preliminary summary, the Department concedes that the state cannot rely solely on noncompliance with the performance agreement as grounds to terminate parental responsibility, citing In the Interest of R.W., 495 So.2d 133 (Fla.1986), and In the Interest of P.A.D., 498 So.2d 1342 (Fla. 1st DCA 1986). The Department points out that “the performance agreement today is mandated by statute, section 39.451, Florida Statutes [1987],” and is to be used as a tool in reuniting the parent and the child and to be used by the court to “test the willingness of the parent to be a parent.” It contends that the parent’s failure to perform can be used as “evidence of continued abuse, abandonment or neglect by the parent but not as the actual reason for the termination.” The preliminary summary also comments that, “The Supreme Court also answered the question of incarceration as a grounds for termination in In the Interest of B.W., 498 So.2d 946 (Fla.1986),” holding “that incarceration alone is not grounds for termination, rather the state was still obligated to show that the parent abused, abandoned or neglected the child by his or her actions independent of the imprisonment,” and that “consequently, the State does not use the Appellant’s incarceration in any way to seek termination of the Appellant’s parental rights.” (Answer Brief, pp. 3-4).
In its four-page argument section, the Department states that “termination of parental rights should not be ordered unless there exists clear and convincing evidence that the natural parent is guilty of conduct constituting the appropriate statutory ground,” and further, that “the evidence in the record must show that the alleged abuse exists at the time of the permanent commitment hearing,” citing In the Interest of A.D.J., 466 So.2d 1156 (Fla. 1st DCA), rev. denied 475 So.2d 693 (Fla.1985) (emphasis added). It further argues that “proof of the abuse may be prospective,” citing In the Interest of A.B., 444 So.2d 981, 994 (Fla. 1st DCA 1983), and that “proof of,abuse against one child may be proof against all the children of the parents,” citing In the Interest of W.D.N., 443 So.2d 493 (Fla. 2d DCA 1984).
The facts argued as carrying the Department’s burden of proof of the allegations of abuse consist of the October 23, 1981, incident when appellant and Betty got into an argument and “DJS was struck by the Appellant while being held in the arms of the mother.” Since JG’s birth, appellant “was involved in another violent altercation with the mother”:
In that event, on January 11, 1985, the Appellant tried to find the mother and the boys and found them with the mother at her boyfriend’s house (R: 52). In his attempt to see the mother, the Appellant and the boyfriend got into a struggle in which the Appellant was shot. (R: 56-59). The children were in that house when the shooting occurred.
The striking of DJS and the history of physical violence are proof of abuse by the Appellant and show evidence of prospective abuse that, were JG to be returned to the custody of the Appellant, the boy would be subjected to potential future harm. This evidence is sufficient to sustain the clear and convincing standard and is proof of “significant impairment” as required by In the Interest of K.H., 13 F.L.W. 1207 [527 So.2d 230] (Fla. 1st DCA May 18, 1988); In the Interest of G.D.H., 498 So.2d 676 (Fla. 1st DCA 1986). See also, In the Interest of T.S., 511 So.2d 435 (Fla. 5th [2nd] DCA 1987).
(Answer Brief, pp. 6-7).
The brief then refers to the allegations that appellant neglected his son “by allow *683 ing him to remain in the custody of his mother when the Appellant knew that leaving the boy with the mother was detrimental (R. 358),” and states that section 39.-01(37), Florida Statutes (1987), defining neglect means “while being able, the parent having primary responsibility of the child deprives or allows the child to be deprived of food, clothing and shelter to the point that the child is substantially impaired.” (Answer Brief, p. 7) (emphasis added). The Department’s brief continues, however, “While it is true that the Appellant never had legal or physical custody of his son or DJS, the Appellant should have initiated some action to gain custody to prevent further harm to his son and DJS while in the custody of the natural mother.” Specifically, the Department argues, “To alleviate these problems, the Appellant was assigned certain corrective tasks in his performance agreement to show to the court that he could be a proper parent.” Thus, commenting on appellant’s failure “to secure suitable shelter for himself and the child,” the Department says that “Appellant neglected his son because he did not secure independent living arrangements but rather chose to live with his mother and intended to bring his son into the Appellant’s mother's home and raise him there.” Continuing, “the Department argues that appellant did not maintain steady employment as a carpenter, and did not obtain a drug evaluation and psychological evaluation, saying he did not have the money, but he did not ask the Department to provide this evaluation,” therefore, “This is further proof of the Appellant’s prospective neglect of his son and his refusal to change his ways.” (Answer Brief, pp. 7-8).
The Department’s brief fails to justify affirmance of the judgment. Although suggesting that appellant should have initiated some action to gain custody of his son, the Department does not indicate what he should or could have done. The Department’s brief is strangely silent about the fact that during this entire time, Betty had custody of and primary responsibility for the children at the behest of and under the Department’s supervision being exercised through Ms. Cesulka. The Department’s reliance on the performance agreement as a means of alleviating some of “these problems” (the problems are not specifically identified) makes it perfectly clear that the Department’s argument predicates all proof of neglect on John’s alleged noncompliance with the performance agreement. Although it is true that John could only provide shelter for the child at his mother’s house, the Department ignores its own undisputed testimony that the performance agreement never contemplated that John could have custody of the children at his mother’s home or any other home. The Department’s argument places the responsibility on John for failing to obtain the drug and psychological evaluations; but this argument is a red herring, for the Department’s undisputed testimony is that John never undertook in the performance agreement to accept financial responsibility for this testing, and it is undisputed that the Department never offered John such evaluations at the Department’s expense, although that undertaking should have been specifically spelled out as a Department responsibility in the performance agreement. § 39.451(3)(g), Fla.Stat. (1987), formerly § 409.168(3)(c)7, Fla.Stat. (Supp. 1986). More importantly, the Department concedes that the record in this case “is silent as to any motion [by it] for a psychological evaluation, as now required by In the Interest of S.N., 13 F.L.W. 1225 [529 So.2d 1156] (Fla. 1st DCA 1988), [but] appellant’s counsel did not object to the order for an evaluation below so this recent case is not applicable here.” (Answer Brief, p. 8, n. 1). The truth is, the cited decision did not create a new requirement in 1988, rather it confirmed that section 39.407(13), Florida Statutes (1987), and its predecessor, as well as rule 8.750(b), Florida Rules of Juvenile Procedure, required the state to move for and show good cause why a mental examination of a natural parent seeking custody should be compelled. This requirement antedated the order entered against appellant in this case.
After careful consideration of the respective positions of the parties, the panel decision summarily reversed for lack of legally *684 sufficient evidence to support the termination of appellant’s parental rights based on the allegations of abuse and neglect, one judge dissenting. The Department filed a motion for rehearing. Thereafter, a request for rehearing en banc on the grounds that this case is of exceptional importance was circulated by a judge of this court and voted on favorably by a majority of the judges in active service. An order was then entered directing the parties to brief the decisions in In re the Adoption of John Doe v. Richard Roe, 543 So.2d 741 (Fla.), cert. denied — U.S.-, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), and Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), “as they may pertain to this case, and any other matters which pertain specifically to the Court’s exercise of en banc review under Rule 9.331 ... (‘exceptional importance’ ground).” As a result, the Department, through newly appearing counsel,[8] filed a 42 page brief containing a completely new and lengthy statement of the case and facts, and setting forth extensive reargument of the case well beyond the argument and contentions made in its answer brief. In view of this development, each party was authorized to file additional responsive briefs to these supplemental briefs. The case was then heard on oral argument en banc.
INSUFFICIENCY OF THE APPELLATE RECORD
Before discussing the legal insufficiency of the evidence to support the judgment finding appellant guilty of child abuse and neglect, it is necessary to comment upon the lack of a complete record on appeal. The appellant’s directions to the clerk for the record on appeal included all of the admitted exhibits, and counsel for both parties held the belief at oral argument that all documents and court records judicially noticed by the trial court had been forwarded to this court. Yet the record on appeal does not contain the performance agreements that the Department says appellant failed to comply with. Nor does the record on appeal include the prior proceedings, motions, orders, and reports filed in this case that the trial court judicially noticed during the permanent commitment hearing now being reviewed.[9] Missing from the record on appeal are the order of adjudication of dependency entered in July 1986, specifically referred to in the appealed judgment, and the judicial reviews required by law.[10] Missing from the record on appeal are all of the reports filed by the guardian ad litem, which mostly contain hearsay, and other reports filed by Department personnel, which also contained much hearsay, despite the fact that the trial court considered at least some of these court records in reaching its judgment. In short, significant portions of the trial record are missing from the record on appeal, although counsel for both parties thought the documents were before this court and agreed that they should be pursuant to the directions to the clerk.
In spite of a request from several judges of this court to have the record on appeal supplemented with these exhibits and court records, a majority of judges voted to reject this request and preclude directions to the clerk of the circuit court to send the performance agreement and the other judicially-noticed exhibits and records to this court. Obviously, these records and exhibits bear materially on the issues and the sufficiency of the evidence to support the judgment.
The en banc decision dismisses the inadequacy of the record on appeal with asser *685 tions that at oral argument appellant’s counsel stated that “the completeness of the record was not an .issue on appeal” and, more specifically with respect to the acknowledged absence of the written performance agreements, that “the performance agreements were before the judge in the form of testimony and that the agreements were used in direct and cross-examination of the witnesses, including the case workers and parents ...” (supra at page 668, note 16). I readily agree that the record on appeal was not an issue between the parties; at oral argument counsel for both parties initially believed that all judicially noticed documents were included in the record on appeal, and they expressed surprise in learning that such documents were not included. Thus, responding to a question from the court early in the oral argument that inquired if the record on appeal contained everything “that was before the trial judge at the time the trial judge considered this matter at the permanent commitment hearing,” appellant’s counsel said, “Yes, Your Honor, I believe so. There has not been an issue of that.” He subsequently learned, however, that none of the judicially-noticed documents were in the record on appeal. When documents judicially noticed by the trial court are thereafter used as the basis for the examination of witnesses whose testimony is critical to the sufficiency of the evidence being challenged on appeal, it should be obvious that reference to the written document will be necessary to a meaningful understanding of the testimony, and that no competent appellate review can be made without having the documents being referred to by the witness in the record on appeal. Moreover, the Department’s counsel candidly stated in response to a question from the court at oral argument concerning court records of the delinquency and other prior proceedings that were not present in the record on appeal:
They should be items of record. There are certain things that should be here. I’ve learned today that apparently they are not. The performance agreements, the dependency adjudications, the periodic reviews, the initial 45-day review for a performance agreement, the sixth-month reviews that are required thereafter. Those definitely need to be a part of the record.
The en banc decision also suggests that the performance agreements need not be in the appellate record because appellant’s counsel “argued against the performance agreements themselves being admitted into evidence since they contained hearsay” (supra at page 668, note 16). I do not understand appellant’s counsel to have argued against the admissibility of the agreements themselves as hearsay; rather, he argued that the testimony regarding what the performance agreements contained and required and the facts on which the witnesses expressed their belief that appellant failed to comply therewith (usually various reports in the court file prepared after ex parte investigation by the witnesses) were inadmissible hearsay. The en banc decision’s misunderstanding of this argument further illustrates the need to review the court files omitted from the record on appeal.
The en banc decision would also excuse the incomplete record on appeal because appellant’s counsel has not sought to supplement the record in this court. Yet appellant’s directions to the clerk were sufficient to require the clerk to include the judicially-noticed documents in the initial record, and under rule 9.200 it became the clerk’s duty to prepare the record in accordance with these directions. Likewise, it became this court’s duty under that rule, upon discovering that the appellate record was incomplete, to enter an appropriate order requiring that the record be made complete. Yet a majority of the court has now precluded any judge of this court from obtaining these documents from the clerk of the court below for use in reviewing this appeal. This action of the court is patent error.
This court has previously held that a final order of permanent termination of parental rights cannot be sustained when court records judicially noticed by the trial court and relied on in reaching a decision are not in the record on appeal. In the *686 Interest of A.D.J., 466 So.2d 1156 (Fla. 1st DCA), rev. denied 475 So.2d 693 (Fla.1985). I am wholly perplexed, therefore, at the majority’s reluctance to permit review of a complete record on appeal that conforms with the understanding of counsel for both parties. Appellant’s lack of compliance with the performance agreement is an essential ground of the final order of permanent termination of parental rights. I cannot understand how this court can affirm that judgment without the performance agreement being in the record, as the Department says it should be.[11] Moreover, since the requirement that appellant execute and comply with the performance agreement is found in the court order of dependency rendered July 21, 1986, on the Department’s petition, certainly the records pertinent to that proceeding and adjudication must be considered on this appeal.[12]
Although we lack a complete record on appeal that accords with the parties’ understanding of what should be here under the directions to the clerk, I now proceed to address the insufficiency of the Department’s case based on the incomplete record before the court. It is my purpose to demonstrate that this appeal as presented by the parties involves only a question of the sufficiency of competent substantial evidence to support the appealed judgment, that the evidence is legally insufficient to carry the Department’s burden of proof, that no question of exceptional importance is involved, and that this is not an appropriate case for en banc consideration. I do this by first discussing the panel decision, and then addressing the en banc decision.
THE PANEL DECISION
The significant issue on this appeal was whether the record contained competent substantial evidence that would support the trial court’s findings of abuse and neglect. No issue of abandonment was made by any party, nor was there any dispute regarding the applicable standard of appellate review. A majority of the panel, upon review of the record, concluded that the record did not contain legally sufficient evidence to support the trial court’s judgment.
The Abuse Issue
The sole ground of abuse alleged by the Department was that John physically abused DJS in October 1981, for which he was put on probation, and that John “has not exhibited an ability to change his behavior toward DJS nor his own child.” (R. 358). The applicable statute defines *687 “abuse” to mean “any willful act that results ’ in any physical, mental, or sexual injury that causes or is likely to cause the child’s physical, mental, or emotional health to be significantly impaired.” § 39.01(2), Fla.Stat. (1987). The panel rejected the Department’s contention that the single episode of child abuse involving DJS in 1981 and the appellant’s persistent aggressive and violent actions toward Betty were legally sufficient to prove that John had abused his son and DJS, and that he was likely to abuse them in the future if he were given custody and parental ties were not permanently severed. There is not one word of evidence in this record showing that John ever intentionally struck DJS, and any express finding of fact to this effect (there was none) could not be sustained. On the contrary, the witnesses who testified about John’s involvement in this incident said they understood he did not intend to strike the child but only intended to hit Betty. The judgment prepared by the Department recites that John hit DJS during “a physical altercation with Betty.” (R. 396). The Department’s answer brief accepted the statement of facts as set out by appellant. Appellant’s initial brief recited that the Department’s witness, Joe Stanton (John’s supervising probation officer after the 1981 incident), testified that the physical assault was directed to Betty, not DJS, and that John “on more than one occasion expressed heartfelt regret as well as a strong love for the child, DJS.” (Initial Brief, p. 5). There is simply no evidence in this record that can support a finding that John intentionally, rather than accidentally, hit DJS.
Nor is there any evidence that John ever struck either child after that incident, or that John ever acted in a physically violent and abusive manner with respect to the children. Admittedly, John has a criminal record, but none of the charges involved acts of abuse or violence against the children after the 1981 incident. Likewise, while John’s relationship with Betty was stormy and physically violent, and although indicia of physical violence were evident upon inspection of their houses by HRS, there was no showing that John’s physical violence against Betty ever occurred in the presence of the children after the 1981 incident.[13] Thus, the record contains nothing to prove, under a clear and convincing evidence standard, the Department’s allegation that John, after the incident with DJS in 1981, “has not exhibited an ability to change his [abusive] behavior toward DJS nor his own child.” The most that can be found on this record is that John directed his aggressive violence toward Betty out of jealousy and concern for the children. Not a single witness testified to any fact that suggested John was physically abusive toward either of these children. On the contrary, the undisputed evidence was that throughout the entire period that John was living with Betty the children were under the Department’s supervision, and the Department never found any evidence of child abuse by him during that period or anything else that warranted taking the children from them. This record simply does not show abuse within the statutory definition, that is, a willful act to cause injury to either child.
Likewise, nothing in the cases cited in the Department’s answer brief, In the Interest of A.B., 444 So.2d 981; In the Interest of W.D.N., 443 So.2d 493, requires a contrary ruling. The findings of abuse by the parent based on violence against some but not all of her children in W.D.N. were based on facts differing significantly from the instant case. Among other things, in that case the appealing parent’s oldest child had died in a house fire, and the appealing parent (1) had already been found guilty of child abuse of a six-month-old child with ten bone fractures and the child had been permanently committed; (2) another child was adjudged dependent because suffering from physical problems requiring medical treatment; (3) after these incidents, the parent gave birth to twins, and six months later they were adjudged *688 dependent on a finding of child abuse of one of the twins involving three rib fractures to the four-month-old child; (4) a psychiatric examination of the parent reaffirmed that she was a poor candidate for individual therapy to teach her parenting skills because she had limited intellectual capacity, and was capable of only marginal care for herself and had few resources left over to provide proper nurture and care for a young child. Under these circumstances it is perfectly logical not to wait until the remaining twin is physically abused to commence proceedings. That case, however, simply cannot be read as standing for the legal proposition that once a parent has abused one child on a single occasion, that single incident will support an inference that all other children are likely to be similarly abused. Moreover, it is essential to point out that W.D.N. was decided on the erroneous legal premise that once an adjudication of dependency for abuse has been made, “this satisfies the statutory element of abuse in a subsequent proceeding for permanent commitment and severance of parental rights.” 443 So.2d at 495. It is clear that the grounds for abuse or neglect must be independently established by competent evidence in the adjudicatory hearing on permanent commitment and termination of parental rights, and a finding of abuse cannot be sustained solely on the basis of prior adjudications. E.g. In the Interest of A.D.J., 466 So.2d 1156; § 39.467, Fla.Stat. (1987).
Nor does the evidence show a “significant injury” to either child within the meaning of that term as defined and applied by this court in In the Interest of K.H., 527 So.2d 230 (Fla. 1st DCA 1988), also cited by appellee. There is not one word of testimony that after 1981 these children have suffered any identifiable injury, as statutorily defined, during the time when John was living with Betty and shared custody of the children. The only evidence of any supposed injury (no specific injury has ever been identified) related to the condition of the children in June 1986 after they were placed with the foster parents, and this was at least one and a half years after John had moved out of the residence where the boys were living with him and Betty. There is no evidence showing any relationship between John’s allegedly abusive conduct toward Betty and “the injury” to the children. Most importantly, as to the cases cited in the Department’s answer brief for the proposition that the evidence in this case is sufficient to sustain the judgment finding of abuse, i.e., In the Interest of K.H., 527 So.2d 230; In the Interest of G.D.H., 498 So.2d 676 (Fla. 1st DCA 1986); In the Interest of T.S., 511 So.2d 435 (Fla. 2d DCA 1987), the court’s decision in each case reversed the findings of abuse and neglect for insufficiency of the evidence.
The Neglect Issue
Neglect is statutorily defined as occurring “when the parent or legal custodian of a child ... deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment or permits a child to live in an environment when such deprivation or environment causes the child’s physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired.” § 39.01(37) (emphasis added). The Department alleged only that John “has neglected his child by allowing Betty to retain custody of his child which placed his child at risk.” There is considerable doubt that this allegation is facially sufficient to show neglect under the statutory definition. However, it is perfectly clear that the record contains no evidence showing that John should have taken any steps other than what he did to protect the boys from neglect by their mother, Betty, to whom the Department had entrusted their custody, or that John was otherwise responsible for neglect of his child under the statutory definition. The Department’s witnesses said that after Betty and John “split,” John made complaints about Betty’s care for the children, and on some occasions the Department found reason to intervene. Richard Schwab, a Department intake counselor, testified that he investigated John’s complaint in March 1986 that Betty’s boyfriend Richie had thrown the children down the stairs and through the *689 door, and although he did not “substantiate” the claim at that time, he did not close the file on this complaint, so he suspected there was abuse. (R. 91-92). The June 1986 incident that resulted in the dependency proceeding was brought to the Department’s attention by John and investigated by the Department’s community control counselor, Harvey Hanson. Finding the children alone, Hanson testified that the children appeared to be fairly secure and comfortable with John, and it was his recommendation that John take the children home for the evening rather than place them in a temporary foster care facility for the night. (R. 82). Hanson characterized the relationship that he observed between the boys and John as that of a father towards his sons, and that John’s actions and behavior on that occasion were those of a responsible parent. (R. 82-83). These facts are set forth in the statement of fact in appellant’s initial brief, and the Department’s answer brief does not contest their truthfulness but rather agrees with them. There is nothing in the record showing that John’s attitude and care for the boys suffered an adverse change after that time.
The Department’s answer brief correctly concedes that it cannot use a parent’s failure to comply with a performance agreement as the sole grounds to terminate the parent’s rights, In the Interest of R. W, 495 So.2d 133 (Fla.1986). While section 39.467(2)(e), Florida Statutes (1987), authorizes a court to consider the “failure to substantially comply with the agreement” as “evidence of abuse, abandonment, or neglect,” this contemplates that the particular abusive or neglectful practices charged against the parent have been identified in the performance agreement and not corrected as a consequence of the failure to perform the agreement. Unfortunately, the performance agreements with John are not in the record before this court, and it is impossible to determine from the trial transcript just what acts of neglect (or abuse) were made the subject of that agreement. Hence, it is clear that the Department’s allegations and proof of neglect may not be held sufficient on this appeal simply by reference to testimony regarding appellant’s failure to comply with certain general conditions of his performance agreement; the failure to comply must relate to specifically identified acts of neglect. Yet the only factual events in support of neglect argued by the Department in its answer brief relate to John’s nonperformance of such general conditions in the agreement. The Department’s brief never identifies what steps John should have taken to remove the children from Betty’s custody, and the Department’s counsel was likewise unable at oral argument en banc to identify what steps John was expected to take. Even though the Department had both children under its supervision from February 1982 until 1986, when they were transferred to foster care, not once during that time did the Department ever indicate to John that Betty’s home environment was so deficient that it constituted neglect of the children. In sum, there is no evidence in this record that John was guilty of neglect as alleged, even if it be supposed that the allegation was legally sufficient to charge neglect under the statute in the first place.
Looking specifically at the statutory definition of neglect, there is no allegation or evidence in this record showing that John was responsible for depriving his child of “necessary food, clothing, shelter, or medical treatment.” Nor is there any evidence that John neglectfully permitted his child to live and remain in an environment that caused or was likely to cause the child’s physical, mental, or emotional health to be significantly impaired. During her four years of supervision from 1982 to May 1986, Ms. Cesulka never found any home condition that warranted removing the children from their environment. No expert witness identified any specific injury to JG’s physical, mental, or emotional health. Only after the child was placed in a foster home did anyone purport to observe questionable behavior, and no medical, psychiatric, or psychological testimony was ever presented by the Department to explain that the child’s behavior with the foster parents amounted to the required statutory injury and was attributable to something *690 John did or did not do for the child prior to the Department’s taking custody of him in 1986. It is only pure speculation to say this evidence supports a finding of neglect within the statutory definition; it most assuredly is not proof by clear and convincing evidence.
Moreover, the performance agreement relied on by the Department was patently invalid and could not, therefore, serve as a basis for permanent termination of parental rights. It is now well established that parental rights cannot be terminated without the Department first offering each natural parent a performance agreement in compliance with the statutory requirements. Williams v. Department of Health and Rehabilitative Services, 482 So.2d 1371 (Fla.1986); Burk v. Department of Health and Rehabilitative Services, 476 So.2d 1275 (Fla.1985); In the Interest of H., 494 So.2d 304 (Fla. 1st DCA 1986). It is undisputed from the testimony of the Department’s witnesses that neither performance agreement executed by John contemplated the return of either child to his custody. The Department never considered placing either child with John and allowing him to live with John and his mother. In fact, the Department’s counsel- or administering the performance agreements candidly testified that the Department only made the agreement with John so the Department could place the children as quickly as possible out of foster care (R. 184-85), obviously meaning that the Department never intended to permit either child to live with John and was going through the procedure so the children could be permanently placed for adoption as quickly as possible.
The objective of returning the child to the custody of the natural parent is an essential statutory element of every valid performance agreement. “The purpose of a performance agreement is to ensure permanency for children through recording the actions to be taken by the parties involved in order to quickly assure the safe return of the child to his parents or, if that is not possible, the permanent commitment of the child to the department or licensed child-placing agency for the purpose of finding a permanent adoptive home.” § 39.451, Fla.Stat. (1987), formerly § 409.168(3)(a), Fla.Stat. (Supp.1986). The performance agreement must include, among other things, “the date on which the child is expected to be returned to the home of the parent_” § 39.451(3)(h), Fla.Stat. (1987), formerly § 409.168(3)(c)8, Fla.Stat. (Supp.1986). It must state “The specific description and nature of the effort to be made by the social service agency responsible for the placement to reunite the family.... § 39.451(3)©, Fla.Stat. (1987), formerly § 409.168(3)(c)9, Fla.Stat. (Supp. 1986) (emphasis added). The agreement must also set forth “that, pursuant to s. 39.41, the court shall return the child to the custody of the natural parents upon expiration of the agreement if the parents have substantially complied with the agreement....” § 39.451(3)©, Fla.Stat. (1987), formerly § 409.168(3)(c)10, Fla.Stat. (Supp. 1986). These statutory requirements are straightforward, unambiguous, and mandatory. There is simply no doubt that a performance agreement meeting the requirements of this statute must contemplate the alternative of returning the child to the parent’s custody upon satisfactory compliance with its terms, and only upon failure to comply with a valid performance agreement is the Department authorized to proceed with permanent termination of parental rights. Additionally, waiver or other failure by the natural mother to preserve her parental rights cannot interfere with the natural father’s right to enter into a valid performance agreement pursuant to the statute. Williams v. Department of Health and Rehabilitative Services, 482 So.2d 1371. We can only accept the undisputed testimony of the Department’s witnesses that these essential conditions required by the statute were not part of the agreements. It follows that the Department’s reliance on such a legally insufficient and invalid performance agreement cannot serve as a basis for ordering perma *691 nent termination of appellant’s parental rights.[14]
For all of the foregoing reasons, it was the panel’s decision to reverse for insufficiency of the evidence. That decision was correct at the time, and it remains correct today, notwithstanding the additional issues seemingly injected into this case through the en banc proceeding.
The Department’s motion for rehearing (which did not request en banc) contends that we erred in “reversing a trial court decision that was supported by competent substantial evidence,” and erred in “misconstruing the principles of law set out in In the Interest of W.D.N., 443 So.2d 493, and Yem v. State, Department of Health and Rehabilitative Services, 462 So.2d 1147 (Fla. 3d DCA 1984).” Yem had not been cited in the answer brief, and is patently distinguishable on the facts.[15] W.D.N was patently distinguishable on the facts as well as on its erroneous statements of law, as discussed above. Also, the Department’s motion improperly contained extensive reargument on the same issues discussed in the answer brief and cited additional appellate decisions not previously cited for fundamental legal propositions that were not in dispute. A majority of the panel voted to deny the motion for rehearing. Before the order was released, however, the court received an internal re *692 quest and voted to rehear the case en banc as a case of exceptional importance.
THE EN BANC DECISION
As previously indicated, I do not agree with the en banc decision for several reasons. First, it is predicated on an inaccurate assessment of the facts proven by the evidence in this record in several material respects. Second, it misapprehends the applicable law and incorrectly applies certain appellate decisions to the facts of this case.
The Abuse Issue
The en banc decision mischaracterizes the 1981 incident with DJS by suggesting that John struck him “repeatedly in the face” (supra, p. 657), and concluding that
The trial court was not required to disregard the child abuse of D. for any of the reasons stated by appellant. Nor was the trial court required to believe that the beating, resulting in nine separate bruises to the child’s face, was “accidental.”
(supra, p. 663). The truth is, John did not strike DJS “repeatedly” and there is no evidence to support that statement of fact. The Department’s evidence established only that John accidentally struck DJS while attempting to hit Betty, nothing more. The photograph of the child in evidence shows that the multiple bruises referenced by the en banc decision reflect the imprint of John’s hand consistent with the evidence of a single blow. Accordingly, the trial court order recites only that John hit DJS during an altercation with Betty; it does not find that John repeatedly battered the child. There was never even a suggestion by any witness or counsel during the final hearing that John intentionally and repeatedly hit the boy. Thus, the en banc decision has violated the very standards of appellate review discussed in the opinion, which proscribe an appeal de novo, because the en banc decision has reevaluated the evidence and found new facts to support its result.
Perhaps the most obvious error regarding the lack of evidentiary support for abuse lies in the en banc decision’s reliance on the criminal doctrine of transferred intent to justify the finding of fact that John intentionally, not accidentally, hit DJS in 1981 (supra at page 663, note 15). This doctrine is usually applicable in criminal prosecutions for first degree murder as a means of attaching criminal responsibility for premeditation or intent to commit murder that results in the death of another person. E.g. Bello v. State, 547 So.2d 914 (Fla.1989); Provenzano v. State, 497 So.2d 1177 (Fla.1986); Wilson v. State, 493 So.2d 1019 (Fla.1986); Lee v. State, 141 So.2d 257 (Fla.1962). This doctrine has also been applied in aggravated battery prosecutions when a misdirected blow strikes one other than the intended victim. In this sense, therefore, the doctrine is a legal fiction based upon the concept that a criminal act directed against the intended victim determines the level of the criminal conduct or offense the defendant will be held accountable for even though this criminal act causes injury to one other than the intended victim. See Coston v. State, 139 Fla. 250, 190 So. 520 (1939), cited in Valassakis v. State, 187 So.2d 74, 77 (Fla. 1st DCA 1966), for the doctrine quoted at page 16, note 15, of the en banc decision.[16] It may well have been appropriate to apply this doctrine in the 1981 criminal abuse action against John as the legal basis for holding him criminally responsible for striking DJS even though he intended to strike Betty only. So far as I have been able to determine, however, this doctrine is not applicable in civil cases to provide essential eviden-tiary proof that an intentional act directed to one person is in fact an intention to harm the unintended victim, and the en banc decision cites no authority supporting such use of this doctrine to affirm the appealed order. This doctrine simply is not a rule of evidence that conclusively establishes as a fact, by presumption or inference, that John actually intended to strike DJS, so that this inferred fact can in turn *693 permissibly serve as the evidentiary basis for drawing the further inference that John will likely, now or in the future, hit DJS again, or hit JG who was born two years thereafter. Application of this doctrine to this end amounts to piling an inference upon an inference, an invalid practice long discredited under Florida law.[17] This doctrine of transferred intent is simply not applicable to prove a person’s actual intent in a civil action by clear and convincing evidence, or any lesser standard of proof. Thus, to predicate a finding in 1987 of child abuse against JG, born in 1983, on a single incident involving DJS in 1981 by the application of the doctrine of transferred intent, as the en banc decision does, amounts to nothing more than engaging in pure speculation and is clear error.
Similarly, it is an error of law to rely on John’s “criminal conviction for child abuse” as proof in this civil action for termination of parental rights (see final order, R. 396).[18] In fact, adjudication of guilt on the child abuse charge was withheld and a sentence of probation imposed. While John’s plea of nolo contendere was sufficient in the criminal action to permit the imposition of criminal sanctions on a child abuse charge, that plea did not constitute an admission of intentional abuse within the statutory definition, and it cannot be used as competent proof of intentional abuse in this proceeding. Wyche v. Florida Unemployment Appeals Commission, 469 So.2d 184 (Fla. 3d DCA 1985); § 90.410, Fla.Stat. (1987).
The en banc decision further rationalizes that because appellant had lived with Betty and DJS for more than a year and “considered himself D.’s father” ... “appellant’s abuse of the infant D. can be considered as bearing on appellant’s conduct with regard to J., his biological child” (supra, p. 663), citing In the Interest of W.D.N., 443 So.2d 493, for the proposition that a parent’s abuse of one child can be properly considered as a basis for permanent commitment of the other children against whom no acts of abuse have been reported. The validity of the stated proposition is self-evident; its proper application is not. While that proposition may be appropriately applied in cases factually similar to W.D.N., that case is completely distinguishable for reasons already set forth. In W.D.N. the court specifically found on the facts described that the “mother’s propensities in that regard [risk of harm to the children] were shown to be beyond reasonable hope of modification.” 443 So.2d at 495. No evidence of John’s continuing propensities for abuse against any child was presented by the Department in the case now before us.
The en banc decision also relies on the proposition that “abuse may be established prospectively based on clear and convincing evidence that the child is or will be abused,” citing several cases (supra, p. 663). There is no question as to the correctness of the stated proposition in the abstract, for it substantially tracks the statutory definition; but it is applicable only in appropriate circumstances. Again, however, not one of the cited cases applying this principle is factually similar to the instant case. None of them hold that evidence of a single occurrence that is not thereafter repeated is legally sufficient to support an inference that one will nevertheless repeat such conduct in the future.
Reliance on John’s persistent violent actions against Betty on the authority of Carr v. Phillips, 540 So.2d 168 (Fla. 4th DCA 1989), is likewise misplaced. That case is also so factually distinguishable it has no value in deciding this case; and its holding on the legal issues then before the court do not permit of the conclusion in this case that appellant’s physical fights with Betty can also be treated as competent evidence that John was similarly aggressive and dangerous in his attitude and conduct towards either child. That case also did not involve proof of child abuse under the clear and convincing evidence standard.
*694 The conclusion in the en banc decision that, “The child J. was subjected to the violent, abusive environment and was at risk of being the victim, as his brother had been, of a beating intended for his mother” (supra, p. 664), is again not supported by a single fact, for the record fails to establish that any of the physical altercations between Betty and John, other than the 1981 incident, took place in the presence of the children. And Ms. Cesulka, whose testimony the decision relies on in reaching this conclusion, most assuredly did not fear that the children were subject to any such risk, as she testified for the Department that the home conditions while Betty and John lived together did not warrant removing the children from home. (R. 116).
The en banc decision also concludes that, “J.’s condition at the time he was taken into foster care, followed by marked improvement after being in foster care, evidences the damage to the child resulting from the conditions under which he had been required to live” (supra, p. 664). The Department presented no witness qualified to opine that this behavior was damage or injury under the statute. Even if this evidence and finding on behavior may be considered relevant and probative of Betty’s neglect or abuse, it was not shown to have any causal relationship to John’s conduct, for John had not lived with Betty for nearly IV2 years before the children were put in foster care; and there was no showing that the children were in this same condition when John last lived with Betty. The only evidence of the child’s condition at the time John left Betty came from Ms. Cesulka, and she said that she never knew of any home condition that would warrant removing the children from Betty's custody. There was testimony from the foster mother that DJS, while in foster care, exhibited aggressive behavior for about two days after visiting with John in March 1987, but that witness said that John’s mother was also present at that visit, and the witness further explained that DJS also had this reaction when he visited with his mother, grandmother, and even representatives of the Department. No qualified expert witness presented any testimony to establish that the conduct of the two children observed by Ms. Medaugh, JG’s preschool teacher (R. 103-07), and Mrs. Martin, the foster parent (R. 124-35), during 1986-87 was related to anything that John did. For all this record shows, the children’s aggressive behavior and other unusual reactions may have been attributable to their forced removal from their natural parents and placement in a strange home. In short, there is no clear and convincing evidence to show that John’s intentional misconduct has in any way injured either boy, although that is what the statute requires to establish abuse.
Finally, the en banc decision says that John “has proved by his own conduct that violence and substance abuse are his way of life by continuing domestic violence, violation of community control, and commission of criminal offenses” and this indicates that “he was not willing to modify his behavior so that a court could reasonably find that the child would not be ‘at risk’ with him” (supra, p. 664-665). The evidence did not show that any criminal offense occurred after 1981 in the physical presence of the children or in any way constituted an intentional act of abuse that resulted in any identifiable injury within the meaning of the statute. The Department has disavowed reliance on John’s sentences to incarceration, and after 1981 none of his violations was shown to involve a risk of harm from abuse. To conclude that this conduct proves that the child is still “at risk” of abuse at the hands of John is an indulgence in speculation, not a finding of fact supported by clear and convincing evidence.
The bottom line of the en banc decision on the child abuse issue is simply this: John has or probably will commit physical abuse of JG because John intended to hit DJS in 1981 (an intent established only through reliance on the criminal doctrine of transferred intent) in a single incident, which single incident occurred two years before JG was born and, even though John thereafter continued to engage in episodes of violence against their mother Betty, was not thereafter repeated against DJS, JG, or *695 any other child; and that these occurrences collectively constitute clear and convincing evidence, under the principle of prospective abuse or conduct, that JG is at substantial risk of physical abuse from John now and in the future. In other words, under the en banc decision it is necessary to apply the doctrine of transferred intent in tandem with the principle of prospective abuse in order to have legally sufficient factual support for the trial court’s finding of child abuse at the December 1987 hearing. The absurdity of such a proposition is self-evident; this manipulation of the evidence does not and cannot legally meet the clear and convincing evidence standard required of the Department in this termination .of parental rights proceeding.
The Neglect Issue
The en banc decision departs from the allegations of neglect in the Department’s petition and attempts to justify its finding of neglect on matters not alleged. There is not one word in the entire en banc decision directed to the Department’s allegation that John “has neglected his child by allowing Betty [the mother] to retain custody of his child which placed his child at risk.” (R. 358). It suggests nothing that John should or could have done to remove his child from Betty’s custody during the time the Department was maintaining supervision of his child, placing his child in Betty’s care, and found no reason from 1982 to June 1986 to remove him from Betty’s custody. Instead, the en banc decision devotes its discussion to John’s failure to make all support payments due, including the eleven months he was in jail, and alludes to his record of unsteady employment. It relies primarily on John’s failure to comply with the performance agreement. The bulk of the discussion about JG’s behavior after being delivered to the foster parents (supra, p. 664-665) is, for reasons discussed above, not probative of anything related to John’s alleged neglect.
The en banc decision refers to the preschool teacher’s testimony about the incident in which she said JG spit out his medicine and licked it off the floor, saying that his mother and father told him to do this (supra, p. 665). Yet the opinion does not take into consideration that on cross-examination this witness clarified her testimony, saying that JG “just said that he had learned it from his mother and that was all he said.” (R. 107-08). Again, this mischaracterization of the testimony creates an inaccurate picture. An appellate court reviewing testimony should not just accept one statement or string of words without reading them in context with the whole of the witnesses’ testimony, including cross-examination. The appellate court’s task is to understand the testimony and what the witness intends to say. Clarifying statements on cross-examination should not be ignored. An appellate court’s function is not properly fulfilled when a pertinent explanation by the witness of what he or she means is not considered.
There is no disagreement with the proposition that a parent does not have to have actual custody of a child in order to neglect a child as discussed in Yem (supra, p. 666), but that fact did not avoid termination of parental rights in that case under vastly different circumstances from the instant case. The child in Yem was not placed under the Department’s supervision when born to the mother in prison, but rather was taken by the father to live with the grandfather, where the child remained until the grandfather died and the child was found wandering around the streets. The living quarters were then inspected and found to be filthy. The Department took the child into custody at that point and initiated permanent commitment proceedings. So the child had not been under Department supervision at all, quite unlike this case now before us, where the Department commenced voluntary supervision of JG when he was born. Moreover, the court in Yem indicated that the mother could have made arrangements with other relatives to take care of the child but failed to do so and “thus neglected her child by permitting the child to live in an environment condemned by the Florida Juvenile Justice Act.” 462 So.2d at 1149. Thus, critical differences between Yem and the instant case are found in the absence of *696 Department supervision of the child in Yem during the time the alleged neglect occurred and also in the egregious circumstances in which the child was living when found. In the instant case, the Department discussed with John’s mother (JG’s grandmother) the prospects of her taking legal custody of the two boys and adopting DJS, which she declined due to her limited funds and age; but the Department never considered allowing the boys to live with John in his mother’s house and allowing John to care for the boys with her assistance, and it never even inspected her house to see whether it was suitable. Thus, there is absolutely no evidence to support a finding of fact that this housing environment, although available, could not be acceptable under the statute.
Similarly, the other cases cited in the en banc decision (supra, p. 666-667) are factually distinguishable, involve far more egregious evidence of abuse and neglect than shown in the instant case, and do not mandate affirmance of the appealed order on the deficient record before us.
In summary, the en banc decision affirms the trial court’s finding of neglect, not on the grounds alleged in the Department’s petition, but on grounds that appellant failed to provide financial support for the child, and communicated to the Department harassing but allegedly unsubstantiated charges of Betty’s abuse and neglect of the children, and concludes that from this evidence the trial court could determine that appellant’s concern for his child was not genuine (supra, p. 666-667). The problem with- reliance on these facts, however, is that the court below made no such findings in the appealed judgment. The record contains no evidence to prove by clear and convincing evidence that appellant neglected his child as alleged in violation of the applicable statutory provisions.
The Performance Agreement
The en banc decision’s discussion of appellant’s failure to substantially comply with the performance agreements fails to address a threshold defect in the agreement, i.e., the lack of a provision concerning the return of the child to John as a natural parent. This deficiency has been fully discussed above and clearly prevents the court from ordering the termination of appellant’s parental rights on the basis of these agreements. Whether appellant did or did not comply with all of the provisions of the agreement, therefore, is unnecessary to the disposition of the Department’s petition and this appeal.
Since this case is now being decided en banc on issues well beyond those pleaded by the parties, two further points need to be made regarding the performance agreements with appellant. First, the pertinent statutes require that the performance agreement contemplate the return of the child to the natural parent signing the agreement, as previously discussed, but that was not done in this case because the Department never had any intention of giving John custody of his son or DJS. Rather, the performance agreement was required in the dependency order entered by the trial court on July 21, 1986, only as a condition to John’s exercising visitation rights. It was decreed, however, pursuant to an evidentiary hearing on the dependency petition held without John being present, without notice to him and an opportunity to be heard, and without service of a copy of the dependency order on John. The performance agreement, therefore, was not in accordance with the statute and was required by the court order entered without any semblance of due process being accorded to the appellant.
Second, it does not appear from this record that the performance agreement was ever submitted to the court for review and a determination that it complies with statutory requirements for content, as mandated by the statute in force when the agreements were made. § 409.168(3)(f), Fla.Stat. (Supp.1986). The statute provides for a hearing on this review so that the parent can be present and heard. This serious omission further invalidates the efficacy of the agreement as a predicate for terminating John’s parental rights.
Termination of Parental Rights
The en banc decision states that at no time has appellant sought custody of the *697 child. That statement is contrary to appellant’s stated position and testimony at the final hearing. John told the trial court in this case that he wanted custody of his son and of DJS if the court would allow it. More importantly, at least two witnesses for the Department testified that John had inquired about obtaining custody of the children, but it is undisputed on this record that the Department never considered that option for John and the children. Nothing in the record supports the statement in the en banc decision that “he [John] seeks to retain his parental rights by having the child J. remain in the limbo-land of foster care” (supra, p. 669).[19]
Additionally, the en banc decision applies the wrong statutes to resolve the issues on this appeal. Section 409.168(l)(a), Florida Statutes (Supp.1986), quoted in the en banc decision, supra, at page 669, had been repealed at the time of the final hearing in December 1987 and replaced by section 39.-45(2). Ch. 87-289, § 9, Laws of Fla. The amendments made by chapter 87-289 became effective October 1, 1987. Ch. 87-289, § 12, Laws of Florida. It is fundamental that the court must apply the laws relating to procedure and remedies in effect at the time of trial and appeal. E.g. Florida Patient’s Compensation Fund v. Von Stetina, 474 So.2d 783, 787 (Fla.1985).[20] Because the amendments by chapter 87-289 involved procedure and remedies for the determination of dependency, placement in foster care, the negotiation of and compliance with performance agreements, permanent placement, termination of parental rights, and judicial review, all being in furtherance of the statutory remedy and confirmation of already existing rights, it was incumbent upon the trial court and this court to apply the 1987 statute, as the Department’s trial counsel correctly informed the court at the commencement of that final hearing (see quote supra, at page 657). (R. 6-7). The statement in the en banc decision at footnote 78 page 11, supra, that in “view of the substantive rights potentially involved here” the decision is based on the “1986 version” of the statutes cites no authority for applying that statute to all issues and is plainly incorrect. This is not an insignificant concern, because the 1987 statutes contain certain provisions and requirements that do not appear in the 1986 statutes. One important difference is the addition of part VI to chapter 39 (sections 39.46 through 39.474) in the 1987 statute, providing new provisions governing the procedures for the termination of parental rights, including the adjudication hearing. Unlike other portions of the 1987 amendments to chapter 39, which had counterparts in former chapter 409, part VI is new.
This difference between the 1986 and 1987 statutes is important because the trial court received and considered reports from the guardian ad litem, which formed the basis of all of her testimony (the reports are not included in the record on appeal). The preparation and filing of these reports in the court file is authorized by section 39.465, and such reports are required to be provided to all parties and the court at least 48 hours prior to a disposition hearing. § 39.465(2), Fla.Stat. (1987). The trial court is authorized to consider hearsay evidence, such as information statutorily authorized to be included in the guardian ad litem's reports and social services studies, at judicial review hearings and disposition hearings. §§ 39.453 and 39.469, Fla. Stat. (1987). However, the hearing we are now reviewing was neither a judicial re *698 view hearing[21] nor a disposition hearing, but an adjudicatory hearing on termination of parental rights as required in section 39.467, Florida Statutes (1987). That section provides, among other things, that “The adjudicatory hearing shall be conducted by the judge without a jury, applying the rules of evidence in use in civil cases_” This means that hearsay evidence is admissible in accordance with the Florida evidence code, which places significant restrictions on the admissibility and use of hearsay evidence. The guardian ad litem’s report and recommendation, as revealed by the testimony, was based almost entirely on hearsay, and we have no way of knowing what portions were excluded and what were not excluded by the trial court.
Section 39.45(2) sets forth the intent of the Legislature as follows:
It is the intent of the Legislature that each child be assured the care, guidance and control in a permanent home which will serve the best interests of the child’s moral, emotional, mental, and physical welfare and that such home preferably be the child’s own home or, if that is not possible, an adoptive home. It is the further intent of the Legislature that, if neither of those options is achievable, other options for the child as set out in this section be pursued. It is the intent of the Legislature that permanent placement with the biological or adoptive family be achieved as soon as possible for every child in foster care and that no child remain in foster care longer than 1 year. It is the further intent of the Legislature that a child be reunited with the child’s natural family whenever possible and, when not possible, that the child be permanently placed for adoption or, when neither option is achievable, that the child be prepared for alternative permanency goals or placements to include, but not be limited to, long-term foster care, independent living, custody to a relative on a permanent basis with or without legal guardianship, or custody to a foster parent on a permanent basis with or without legal guardianship. It is the intent of the Legislature, therefore, to help ensure a permanent home for a child in foster care by requiring a performance agreement or, if the child’s natural parents will not or cannot participate in a performance agreement, a permanent placement plan and a periodic review and report to the court on the child’s status. When two or more children in foster care are siblings, every reasonable attempt shall be made to place them in the same foster home; in the event of permanent commitment of the siblings, to place them in the same adoptive home; and, if the siblings are separated, to keep them in contact with each other.
(Emphasis added). It is evident on this record that the Department did not act in accordance with the legislative intent emphasized above. It never undertook to place JG with his natural father and permit them to live with John’s mother. The Department simply did not consider giving custody of DJS to John. This failure on the part of the Department is inconsistent with the stated legislative intent and applicable Florida appellate decisions.
Additional deficiencies in the Department's handling of this case are also apparent from the record. It does not appear that the court ever held a judicial review of the child’s status as required by section 39.453, Florida Statutes (1987), formerly section 409.168(5), Florida Statutes (Supp. 1986). Had it done so, that proceeding would have been an appropriate time for the court, with John present, to consider John’s taking custody of his son and DJS prior to initiation of this proceeding to terminate his parental rights.
CONCLUSION
It is manifest that appellant has not been accorded the due process of law to which he is entitled under the statutory require *699 ments for terminating his parental rights. This record does not contain competent proof legally sufficient under the applicable statutes to show by clear and convincing evidence that appellant either abused or neglected his child JG, or DJS, as alleged in the petition.
The Department’s contentions and the en banc decision’s rationale for terminating appellant’s parental rights focus almost entirely on the perceived lack of appellant’s fitness as a parent in general and his inability to provide a stable home with Betty, not because he is guilty of specific abuse or neglect of the children within the strict meaning of the statutes. No one denies that appellant’s past conduct and criminal record leave much to be desired, but his general unfitness as a parent is simply not the sole dispositive issue in this case. The legislature has not authorized children to be taken from their natural parents because the parents are not as fit as the state or some court wants them to be; instead, the legislature has set strict criteria and procedural requirements that limit the grounds for termination of parental rights to abuse, abandonment, or neglect, all being statutory terms having fixed meanings. Thus, courts are not free to terminate parental rights by imposing their own notions of justice and parental fitness in derogation of manifest legislative intent. My quarrel with the en banc decision is that it constitutes an adjudication terminating appellant’s parental rights based on lack of fitness only, rather than violation of the statutory reasons imposed by the legislature.
In Kersey v. State, 124 So.2d 726 (Fla. 1st DCA 1960), this court stated in ordering a child returned to its natural parents:
The Court in the exercise of its role of guardian of dependent children should at the same time zealously guard the rights of natural parents. Particularly should it be true in this age of creeping paternalism at all levels of government in this country that individuals may confidently look to the courts to fulfill their historic role of guardians of the rights and liberties of the people, one of which is to rear, train, care for, and enjoy the companionship of their children, without the threat of unreasonable interference of governmental authority.
124 So.2d at 730. Although those words were written in 1960, they remain as true and viable today as they were at that time.
The extraordinary length of this dissent alone serves to convey my deep concern that the en banc decision will be allowed to stand as bad legal precedent for seriously relaxing, if not judicially overriding, important statutory requirements governing the termination of parental rights. The errors in that decision stemming from misconceptions of the law and the erroneous misapplication of other principles of law substantially erode the due process protections accorded to natural parents’ interests and rights in their children. My concern is not for the parents alone, however; it is equally as great for these two boys who have evidenced a strong desire to maintain their relationship with appellant. Unfortunately, the Department’s preoccupation with compelling John and Betty to live together with the two boys as a family unit, and the Department’s steadfast opposition to even considering giving John custody of his son JG, and DJS, to live apart from Betty, have resulted in a prolonged disposition of this case by the Department to the detriment of the children and John, without according John the minimum legal rights he is due under the applicable constitutional and statutory provisions.
Finally, there is no demonstrated reason for this case to be heard en banc by this entire court. No issue of law of great public importance is involved on this appeal, despite the en banc decision’s attempt to create one. The only issue of importance is whether the record contains sufficient evidence to support the appealed judgment. While it is obviously necessary to read this entire record to determine that issue, that task should be done by the panel of three judges, not by all thirteen judges of this court. Resolution of differences of opinion among the panel members concerning the evidence is not a matter for the entire court in a case like this. This case should never have been considered en banc.
*700 I would adhere to the original panel decision reversing the appealed judgment.

. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Torres v. Van Eepoel, 98 So.2d 735 (Fla. 1957). This standard has been codified in the applicable Florida statute. § 39.467, Fla.Stat. (1987).

. This opinion does not include the issues and evidence pertaining to the mother, Betty, except as incidentally involved in appellant’s case, since she has not appealed the final judgment of permanent commitment.

. The transcription of the trial proceedings in this case was prepared from an electronic tape recording provided by the Clerk of the Court. It contains numerous instances of "inaudible" statements.

. The episodes based on this witness's testimony and described in the en banc decision (at pp. 5-7), about the children not being fed and clothed properly, and that JG was found “drinking the dregs from a beer can,” occurred nearer the end of Ms. Cesulka’s supervision (R. 110— 113), that is, long after John was no longer living with Betty.

. The witness stated:
A. Last year’s Christmas card would be a little animal and there was a verse inside of it, I don’t know it, I’ve read it, I would recognize it as soon as I see it, it was hand drawn, it was beautiful, detailed work and the depth and feeling was gorgeous, it was very deep and very meaningful of love and care and concern, yes.
Q. Of John for his son?
A. As far as what that card said. (R. 135).

. It is impossible to discern whether everyone at trial had a copy of the performance agreements, for they were not identified and marked as separate exhibits apart from the judicially-noticed court file. A performance agreement was ordered by the trial court in July 1986 as a condition of visitation by John. These agreements are not included in the record on appeal.

.The original of this order is not in the record on appeal. A copy of it is attached to appellant’s motion for visitation. (R. 367-70). This copy indicates that John was not named a party to the delinquency proceeding, was not present at the hearing (the order recites that Petitioner, Richard Schwab, Betty, L.P. Bush, Betty’s attorney, and Robert C. Elmore, assistant state attorney, were present), and no copy of the order was served on appellant. From this one can only conclude that John was not given notice and an opportunity to be heard at the dependency adjudication hearing.

. Mr. Rodney Johnson, who then appeared for the first time on appeal, was co-counsel for the Department at the trial.

. The documents judicially noticed were described by the Department’s counsel at oral argument: "The entire file from the day of the original dependency back to the original involvement concerning [DJS] was a part of the court record and was adopted as a part of the court record. The judge was going to exclude those items that were not admissible hearsay.”

.In response to questioning from the court at oral argument, the Department’s counsel stated, ”1 would say if it does not contain the prior dependency adjudications and the reviews that did occur as required, that the record is not complete in that respect, Your Honor.”

. Counsel for the Department candidly conceded at oral argument that the Department could not prevail on its petition without having put the performance agreement in evidence and proven appellant’s non-compliance with its terms.

. The Department’s counsel contended at oral argument that he felt certain appellant had knowledge of the 1986 dependency proceeding, but would have to review the record to make that determination. The validity of the dependency hearing, i.e., John’s notice and participation in it and all subsequent proceedings prior to the termination of parental rights hearing, are essential predicates to the valid termination of his parental rights. That is obviously why the Department was required to and did have the trial court take judicial notice of all these records. However, it appears that appellant was not provided counsel until the Department filed its petition for permanent termination in 1987, a fact that suggests that John was not represented in any of the court proceedings before that date. Counsel could not assure this court at oral argument that John was so represented, and nothing in this record reveals that he competently waived this right. (Betty was represented by counsel and apparently appeared at all stages of the proceedings commencing with the dependency hearing.) Thus, there is a serious question, which can only be determined with certainty by reviewing the judicially-noticed court records, as to whether appellant was advised of his right to counsel at the dependency hearing and all subsequent stages of the proceedings pursuant to rule 8.560, Fla.R. Juv.P. Failure to accord appellant his constitutional right to counsel in the dependency proceeding and all subsequent stages of that proceeding, as well as in the permanent commitment proceeding, would be fundamental error and invalidate any order terminating John’s parental rights, whether raised in the trial court or not. In the Interest of D.M.S., 528 So.2d 505 (Fla. 2d DCA 1988); White v. Department of Health and Rehabilitative Services, 483 So.2d 861 (Fla. 5th DCA 1986). See also In the Interest of R.K., 535 So.2d 312 (Fla. 2d DCA 1988); Thomas v. Hoppe, 493 So.2d 549 (Fla. 4th DCA 1986). This is simply another reason why the complete court file below must be made part of the record on appeal before appellant can receive his full right to appellate review.

. The incident at the boyfriend's condominium when John was shot did not occur in the bedroom where the children were sleeping.

. This conclusion was confirmed at oral argument by the Department’s counsel:
THE COURT: And did not the person making this determination testify that never, and this is in response to a question by Judge Fleet, that never once was consideration given to placing those children with John in the home of his mother?
COUNSEL: Your Honor, I think that has to be taken in light—
THE COURT: Wasn’t the question asked and the question answered that way?
COUNSEL: It very well may have been answered that way. However, there were performance agreements, there were efforts to rehabilitate this person to get him to a point where he could take care of these children. Why else have a performance agreement in the first place?
THE COURT: Well, were' those performance agreements for John drafted in such a fashion that he was to do certain things for the purpose of getting custody of his child?
COUNSEL: Yes, Your Honor.
THE COURT: And that would be at the time he would have custody of the child?
COUNSEL: Well, it wouldn’t be a foregone conclusion, but yes, that is the purpose of the performance agreement. That was the whole idea to reunite or to put custody with John. Here we have a situation where we have children that we’re obligated to look for a reunification with the family, as soon as it’s practicable and reasonable and assure the safety of the children. Not only do you consider the mother of the children, you consider the father of the children in that situation, because the father had expressed an interest and that’s what had occurred in this case. That’s why the performance agreements were there.
THE COURT: Well, if that’s so, why was the testimony of several representatives of HRS to the effect that the agreement never did contemplate the custody of the child, the children being placed with John?
COUNSEL: I don’t remember that in the record, Your Honor. That very well may be. I’m not saying it’s not. But there would be no value, no reason, no legal sense of entering into a performance agreement, if custody to that person was not under consideration. That’s what they’re all about.

. The factual distinctions in Yem are exemplified in part by the fact that the mother (the appellant) had the child while she was serving extended incarceration for murdering her stepson, had never had custody of the child, and was shown to be a continuing danger to her child by medical testimony:
One doctor who examined the mother testified that her judgment was significantly impaired and found her to be narcissistic and egocentric. He also opined that the mother was not highly treatable, and that if she were given custody of the child, the child’s physical and emotional needs would be at risk. The other doctor testified that the mother had poor judgment and is unable to control anger. He opined that the mother could not provide for the child’s physical and emotional needs in the long run, and that if the mother had custody of the child, the child’s well being would be in jeopardy.
462 So.2d at 1150, n. 2. The opinion also notes that "the mother essentially concedes the point on the last page of her brief when, while arguing that the evidence is insufficient to show neglect or abandonment, she states that ‘it may be preferable to order the permanent commitment of [the child] and to sever [the mother’s] parental ties.’” Id. at 1150, n. 3.
By way of contrast, in the instant case John had not been examined by any doctors for fitness as a parent, or even by the psychologist who testified to Betty's ’ mental unfitness and potential for abusing and neglecting the children. Moreover, John had completed all of his sentence and was employed and living with his mother at the time of the hearing.

. "When an intent exists to do wrong, and an unintended illegal act ensues as a natural and probable consequence, the unintended wrong derives its character from the general evil intent.” Coston v. State, 190 So. at 522.

. E.g. Voelker v. Combined Insurance Co., 73 So.2d 403 (Fla. 1954); 23 Fla.Jur.2d, Evidence and Witnesses § 87 (1980).

. At oral argument, counsel for the Department argued in support of the abuse charge that John "was arrested and convicted of aggravated child abuse.”

. Although Ms. Molitaris, the guardian ad li-tem, testified that John told her while incarcerated that he was uncomfortable with his child in the care of Betty and Richie, but that he would rather see his son with Betty or in foster care because he would not be able to see his son any more if he was adopted, John’s statement was made in the context that he would not be given custody of his son and he was trying to avoid losing all contact with him. (R. 227-28).

. Statutes that relate to remedies or modes of procedure and do not create new or take away vested rights but operate only in furtherance of the remedy or confirmation of already-existing rights, do not come within the legal conception of a retrospective law or the general rule against retrospective operation of statutes. Id. at 788. See also 3 Fla.Jur.2d, Appellate Review § 398 (1978).

. The Department's counsel tried to have the court treat it as such (R. 354-55), perhaps because so much of the evidence presented by the Department consisted of hearsay information from various reports, and the statutes required a judicial review hearing before proceeding to an adjudication hearing on termination of parental rights.